# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **TAMARA TOMPKINS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | Civil Action Number |
| | } | **5:17-cv-01679-AKK** |
| **CUTS BY US, INC.,** | } | |
| | } | |
| **Defendant.** | } | |
| | } | |

## MEMORANDUM OPINION

Tamara Tompkins filed this lawsuit against her former employer, Cuts By Us, Inc. ("CBU"), for alleged race discrimination and retaliation in violations of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2. Doc. 21.[1] More specifically, Tompkins claims that CBU denied her two separate promotional opportunities to the manager position at its Harvest, Alabama location and also required her to perform managerial duties without any increase in her pay. Doc. 52 at 15. CBU has moved for summary judgment on both claims, contending that Tompkins cannot establish a prima facie case or show that CBU's articulated reasons are pretextual. Based on

---

[1] The court previously dismissed, doc. 34 at 11, Tompkins's alleged claims for sex discrimination (Count II) and a hostile work environment (Count III).

this record and the relevant case law, Tompkins has failed to establish that she applied for one of the positions she challenges, failed to show that racial or retaliatory animus factored in the second promotion decision or that CBU's reasons for that selection are pretextual, and has not shown that the other actions she challenges are adverse employment actions. Therefore, the motion is due to be granted.

## I. LEGAL STANDARD FOR SUMMARY JUDGMENT

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "Rule 56[ ] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment motions, the court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255. Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports the non-moving party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II.    FACTUAL BACKGROUND[2]

Tompkins is a licensed cosmetologist who worked at eight salons, for a year or less at each, prior to joining CBU. Docs. 43-1 at 7-8, 27; 43-9 at 2. Her work history at one of these salons, Head Start, subsequently factored in decisions CBU made against promoting her. Specifically, Tompkins's manager at Head Start, Laura Middleton, who subsequently joined CBU in a similar role, informed CBU that, while at Head Start, Tompkins "started to slack off," had "low productivity," was tardy, used her cell phone at work, and was not available to service clients. Doc. 43-4 at 10. Middleton also reported that Head Start's district manager, Kathy Dabbs, discharged Tompkins purportedly because of a cash drawer shortage. Docs. 43-4 at 16, 21; 43-5 at 18; 43-1 at 13-14; 43-8 at 4. Tompkins disputes this contention and believes that Dabbs discharged her for low productivity. *Id.* at 13-14. In any event, regardless of the reason for the discharge, Head Start rehired Tompkins subsequently. Docs. 43-1 at 15-17; 43-11 at 2; 43-1 at 16.

Tompkins's first employment stint with CBU lasted from June 2008 to April 2009 at CBU's Winchester Road location, under the supervision of Middleton, her former manager at Head Start. Docs. 43-1 at 18; 43-11 at 2. Although Middleton described Tompkins as a good stylist, she noted some issues with Tompkins during

---

[2] On several occasions, Tompkins fails to cite to the evidentiary record to support a factual assertion, *see* doc. 52 at 3-13, in violation of Appendix II, doc. 20 at 9. Purported factual statements without evidentiary support are not "factual."

this period, including once refusing to follow directions to clean the salon and staying outside on her phone instead, and, on another occasion, walking out on her shift when asked to clean shelves. Doc. 43-4 at 17-18. Tompkins's employment ended when Tompkins took maternity leave and never returned. *Id.* at 20.

In July of 2011, CBU rehired Tompkins as a stylist. Doc. 43-1 at 19. During this second and final period of employment, Tompkins worked at CBU locations in Athens, South Parkway, Madison, and Harvest. *Id.* at 21. After initially assigning Tompkins to Athens, approximately a month later, CBU transferred Tompkins to the South Parkway location in Huntsville, Alabama near her home. *Id.* According to the South Parkway manager Jessica Brown, there were several incidents involving Tompkins: (1) two employees informed Brown that Tompkins entered Brown's office one day to look at personnel files, *id.*; doc. 43-7 at 2; and (2) Brown also received a report of "an incident where Tompkins took clippers and a comb out of another stylist's [(Rebecca Dillard)] hands and finished cutting a customer's hair without the stylist's consent[,]" doc. 43-7 at 3. The latter incident made it to the attention of CBU's president and owner, Jeff Kleinman, who received a written statement from Dillard and an oral report from Tompkins. Docs. 43-2 at 4, 30-31; 43-8 at 2, 4, 9; 43-1 at 22.[3] Tompkins also discussed the incident with Janet Johnson,

---

[3] Tompkins asserts that she told Kleinman that "she thought the problem was because she is black . . . ." Doc. 52 at 6-7 (citing doc. 43-1 at 22). But the cited document does not support this statement.

CBU's district manager, whom she claims never informed her that she "could or should provide a written statement . . . ." Doc. 53-13 at 4-5. This incident led Kleinman to send Tompkins home for the day. Doc. 43-1 at 22.

Based on these two incidents, Brown asked Johnson to transfer Tompkins, doc. 43-7 at 3, a separation that Kleinman "deemed necessary . . . .", doc. 43-2 at 32. Consequently, CBU transferred Tompkins to its Madison salon, where she reported to Johnson. Docs. 43-1 at 21; 43-3 at 9. According to Johnson, Tompkins displayed the attributes of a good hairdresser, albeit with some problems — one or two times per week, Tompkins avoided cleaning the salon and went outside instead to talk on her phone, and also changed her own schedule without permission. Doc. 43-3 at 37-38. For her part, Tompkins described the Madison salon as "a hard shop to work in" because of employee conflicts. Doc. 43-1 at 24-25, 26-27. Ultimately, Tompkins became a "key holder" which gave her the responsibility to open and close the salon in the absence of the managers. Docs. 43-2 at 60; 43-1 at 20.[4]

Eventually, Tompkins requested and received a transfer to the Harvest salon which she described as a "quiet, laid back shop." Doc. 43-1 at 24. Concurrent with Tompkins's request, the new manager at Harvest, Krysten Williams, who had

---

[4] Kleinman described the role as one based on trust and scheduling convenience, as determined by the manager. Docs. 43-2 at 60; 43-8 at 7. The designation provided no additional benefits. Docs. 43-1 at 20; 43-8 at 7.

worked with Tompkins at the Madison location, also requested that CBU transfer Tompkins to Harvest in light of Tompkins's familiarity with the management paperwork. Docs. 43-6 at 14; 53-12 at 2. Indeed, after the transfer, Tompkins assisted Williams with the paperwork. Doc. 53-12 at 4. Williams testified that Tompkins functioned well as a "team lead," provided helpful advice, took on responsibility, was punctual, honest and reliable, interacted well with others, and made no complaints. Doc. 53-12 at 4. Prior to resigning as manager at the Harvest salon, Williams recommended that CBU select Tompkins as her replacement. Doc. 53-12 at 4. Although Tompkins also expressed interest in the position, CBU ultimately selected Tammy Orillion to succeed Williams. Docs. 43-1 at 36; 43-8 at 5. And, because of Orillion's unfamiliarity with the paperwork duties, she received assistance from Johnson and Tompkins. Docs. 43-3 at 49; 53-13 at 10. Tompkins also continued to open and close as key holder, and reviewed the schedule to ensure proper shift coverage. Doc. 53-13 at 10.

As part of the process to replace Williams, Johnson interviewed Tompkins, Orillion, Stacy Bailey, and Jamie Quick, all of whom had expressed their interest in the position to Johnson by writing their name on a note that Johnson posted in the office. Doc. 43-3 at 49, 50. As part of her due diligence, Johnson spoke with Middleton, who relayed that Tompkins had problems at the Winchester location with authority, performing her cleaning duties, tardiness, and receiving direction. Docs.

43-3 at 46-47; 43-4 at 22. After the interviews, Johnson shared her impressions with Kleinman, and provided the strongest recommendation for Orillion. Doc. 43-3 at 50-51. Prior to making the decision, Kleinman also reviewed reports he had received from Tompkins's managers and co-workers in 2012, when Tompkins interviewed for a manager's position in Madison. Doc. 43-8 at 5. These reports included allegations of rude behavior, negative attitude, unwillingness to perform cleaning duties, and bad interpersonal skills. Doc. 43-2 at 37-39; 45-46. Kleinman maintains that he selected Orillion because (1) she owned her own salon for eight years, which demonstrated stability and responsibility; (2) as a Redken color specialist, Orillion could help elevate the salon and teach coloring; and (3) she received good reviews from her manager Tammy Cantrell. Docs. 43-8 at 5; 43-2 at 74.

In December 2013, the manager position at Harvest became available again when Orillion stepped down. Docs. 43-1 at 39; 53-3 at 56. Unlike the standard practice CBU followed requiring initial interviews by the district manager, doc. 43-8 at 3, Kleinman chose to personally conduct the interviews for this vacancy, doc. 43-2 at 42. In light of this, when Tompkins contacted Johnson to express interest in the position, Johnson instructed Tompkins to contact Kleinman directly. Doc. 43-1 at 39. Tompkins failed to do so based on her belief that Kleinman would not select her. Doc. 43-1 at 39. Kleinman selected Quick, docs. 43-1 at 39; 43-2 at 42, and sometime thereafter, Quick rescinded Tompkins's key holder status purportedly

because a stylist told Quick that she saw Tompkins going through personnel files without Quick's authorization, docs. 21 at 10; 43-12 at 2. Tompkins maintains that Orillion informed her that Johnson directed Quick to do so because of an EEOC charge Tompkins filed. Doc. 43-1 at 75-76.

Prior to contacting the EEOC, Tompkins attempted first to complain internally. Specifically, on October 8, 2012, Tompkins sent a letter to CBU expressing, among other things, concerns about the failure to select her as a manager in Madison and Harvest, and being "labeled the problem because of [her] race." Docs. 21 at 6; 43-1 at 73-74; 43-24 at 2. However, Tompkins sent the letter to the wrong address, 1216 S. Hwy. 97, doc. 43-20 at 3, rather than the actual address, 1261 S. Hwy. 97, doc. 43-8 at 2,[5] and CBU maintains it never received the letter, docs. 43-8 at 6; 43-2 at 45.

On August 21, 2013, Tompkins submitted a complaint to the EEOC about race and sex discrimination. Doc. 43-20 at 2. In her letter, Tompkins again listed the wrong address for CBU, *id.* at 3, and CBU maintains that it only received a copy after Tompkins filed this lawsuit, docs. 43-8 at 2; 43-2 at 45. A month after sending the letter to the EEOC, Tompkins filed a formal charge of discrimination in connection with the decision to select Orillion for the manager position. Docs. 43-

---

[5] CBU stated this fact in its brief, doc. 42 at 18 n. 3, and Tompkins did not contradict it with a citation to the record as required, *see* doc. 52 at 3-13. Thus, this fact is uncontroverted.

19 at 2; 43-20 at 2. In CBU's response to the charge, it stated, in part, that "Tompkins has not demonstrated the necessary skill set for promotion to assistant manager or salon manager[,]" and that "Ms. Tompkins has not demonstrated the leadership skills and abilities to get along with co-workers and management that [CBU] feels is necessary." Doc. 43-28 at 2.

Roughly two and a half years later, the EEOC informed CBU that it intended to find against CBU. Doc. 43-29 at 2. In response, Kleinman requested an opportunity to review the EEOC's evidence and correct inaccuracies. *Id.* Kleinman then provided additional information, including statements from Middleton, Christina Pinkerton, and Johnson, that described Tompkins as a "very experienced hairstylist," but also that Head Start had discharged Tompkins for allegedly stealing, and that Tompkins had problems with authority and interacting with co-workers, examined personnel files without permission, and changed her schedule without permission. *See* docs. 43-7 at 2; 43-3 at 38-39; 43-35 at 2; 43-30 at 2. While the charge was pending, Tompkins took a leave of absence for health reasons, and resigned shortly thereafter. Doc. 21 at 11. Tompkins subsequently filed this lawsuit.

## III.   ANALYSIS

Tompkins alleges that CBU denied her two promotional opportunities to manager of the Harvest salon and required her to perform the duties without the title or pay. However, Tompkins has failed to show that she applied for the position filled

by Quick,[6] and her discrimination and retaliation claims for this position fail. The court will analyze her remaining claims and the parties' respective contentions below beginning with the race claim.

## A. Race Discrimination

Title VII and Section 1981 prohibit racial discrimination in the employment context. *See* 42 U.S.C. § 2000e-2(a); *Siddiqui v. Netjets Aviation, Inc.*, No. 18-13463, 2019 WL 2323785, at *1 (11th Cir. May 31, 2019) (citing 42 U.S.C. § 1981; and *Standard v. A.B.E.L. Servs. Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)). "Section 1981 and Title VII discrimination claims are analyzed under the same framework." *Siddiqui*, 2019 WL 2323785, at *1 (citing *Standard*, 161 F.3d at 1330). Specifically, where, as here, Tompkins is relying on circumstantial evidence, Tompkins must establish a prima facie case by showing: "(1) [s]he is a member of a protected class; (2) [s]he was qualified for the position; (3) [s]he suffered an adverse employment action; and (4) [s]he was replaced by a person outside [her] protected class or was

---

[6] Although instructed to contact Kleinman to express interest in this position, Tompkins failed to do so based on her view that it would be futile to apply. Doc. 43-1 at 39. While Tompkins may believe she had a valid reason not to apply, the second element of a prima facie case requires that the plaintiff prove that she "was qualified for and *applied* for the position." *Solomon v. Jacksonville Aviation Auth.*, 759 Fed. Appx. 872, 874 (11th Cir. 2019) (citation omitted) (alteration added). In light of Tompkins failure to apply or present evidence that Kleinman interviewed persons for this vacancy who did not apply or express an interest to him, her claim for this position fails.

treated less favorably than a similarly-situated individual outside [her] protected class."[7] *Maynard v. Board of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).

If Tompkins establishes a prima facie case, the burden shifts to CBU to articulate a legitimate non-discriminatory reason for the adverse employment action. *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001). CBU must "raise[] a genuine issue of fact as to whether it discriminated against [Tompkins,]" but it "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 1242-43 (internal quotation marks and citation omitted). Once CBU satisfies its burden of production, "[Tompkins] must show that the proffered reason really is a pretext for unlawful discrimination." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1275 (11th Cir. 2008) (internal quotation marks and citations omitted). Tompkins may demonstrate pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id.* (internal quotation marks and citations omitted). However, "[a] reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.'" *Brooks v. County*

---

[7] The last three prongs change slightly for promotion claims: the plaintiff must "show . . . (2) he [or she] was qualified for and applied for the position; (3) he [or she] was rejected; and (4) the position was filled by someone outside of the protected class." *Solomon*, 759 Fed. Appx. at 874 (citation omitted).

*Comm'n of Jefferson Cty*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). A plaintiff may show pretext using circumstantial evidence "so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff . . . ." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

Lastly, "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith*, 644 F.3d at 1328. A plaintiff may instead show that the "record, viewed in a light most favorable to the plaintiff presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id.* And, "the plaintiff will always survive summary judgment if he [or she] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.*

The alleged racially discriminatory conduct here consists of (1) the decision to promote Orillion to manager of the Harvest salon and (2) requiring Tompkins to perform "manager's duties to support a lesser qualified manager [i.e. Orillion], and in the absence of a manager, when white hairstylists were not." Doc. 52 at 15. As shown below, Tompkins has failed to meet her burden on either claim.

### 1. Whether racial animus factored in CBU's decision to hire Orillion as the Harvest salon manager

CBU argues that Tompkins cannot establish a prima facie case because Tompkins was not qualified, and, alternatively, that Tompkins cannot show that CBU's reasons for selecting Orillion are pretextual. Doc. 42 at 23-24, 26-29. As to the first contention, CBU contends basically that Tompkins did not have the skills for a manager position based on its preference for managers who possessed good technical skills, honesty, an ability to interact well with others, and leadership skills. *Id.* at 23-24; doc. 43-2 at 22. CBU maintains that although Tompkins had good technical skills, it concluded that Tompkins lacked the other skills from conversations Kleinman had with Tompkins's former managers and colleagues, and from reports that Head Start discharged Tompkins for theft. Docs. 42 at 24; 43-2 at 37, 38-39, 45-46; 43-8 at 4-5. Notably, however, the evidence suggests that Tompkins had performed managerial tasks, including completing management paperwork, reviewing the schedule, distributing paychecks, and holding a mailbox key and key to the salon. Doc. 53-13 at 10. Tompkins also refuted CBU's arguments about her inter-personal and leadership skills through Williams's testimony that Tompkins "got along well with her co-workers," and "functioned well as a team lead." Doc. 53-12 at 4. This evidence is sufficient to create a material dispute regarding Tompkins's qualifications. Therefore, because establishing a prima facie

case is not an onerous task, *see Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), the court finds that Tompkins has met her initial burden.

Therefore, the burden shifts to CBU "to produce evidence that there is a legitimate, non-discriminatory reason for the challenged employment action." *Kelliher v. Veneman*, 313 F.3d 1270, 1275 (11th Cir. 2002). CBU's burden at this stage is "'exceedingly light.'" *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1061 (11th Cir. 1994) (quoting *Meeks v Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994). CBU identifies two reasons for its decision: (1) "Tompkins lacked meaningful management experience and had a history of only short stints with prior employers," and (2) that "Orillion[] was far more qualified than Tompkins." Doc. 42 at 25. An employer's explanation "that several candidates are well-qualified for a single position, and . . . that it chose the person it thought best qualified for the job" is ordinarily sufficient to meet its burden. *Smith v. Horner*, 839 F.2d 1530, 1539 (11th Cir. 1988). Consequently, the burden shifts back to Tompkins to prove pretext. *Rioux*, 520 F.3d at 1275.

> a. *Whether Tompkins has established that CBU's reasons for selecting Orillion are Pretextual*

Tompkins makes seven allegations of pretext. *See* doc. 52 at 17-33. However, as shown below, she fails to rebut *all* the reasons CBU articulated for selecting

Orillion. Therefore, the court does not have to reach the rest of her contentions of pretext. However, even if the court considers them, her claim still fails.

### i. Tompkins's qualifications in comparison to Orillion

As part of her assertion of pretext, Tompkins challenges CBU's contention that she is less qualified than Orillion. To rebut CBU's assertions and establish pretext, Tompkins "must show that the disparities between the successful applicant's and her own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'" *Brooks*, 446 F.3d at 1164 (quoting *Cooper v. S. Co.*, 390 F.3d 695, 732 (11th Cir. 2004), *cert denied*, 546 U.S. 960 (2005)). Tompkins is correct in part that she has "meaningful management experience," doc. 52 at 30-31, a fact CBU concedes, and that she received good reviews from one of her managers. The good reviews from one manager, and her other contention that she performed aspects of the position, doc. 52 at 30-31, however, do not negate the negative reviews from the three other managers Kleinman cited, and that the successful candidate Orillion had no negative reviews, a contention which Kleinman also cited as a reason for selecting Orillion and which Tompkins does not refute. And, while Tompkins may have management experience, that is different from ownership of a salon, which CBU believed placed Orillion at a different category than Tompkins. *See* doc. 43-2 at 74. In fact, Tompkins never addressed CBU's reliance on Orillion's experience as

a salon owner for its selection decision. Instead, she attacked only the management and hair coloring rationales. *See* docs. 56-1 at 2 (stating that she also received hair coloring training), and 52 at 32 (stating that Kleinman offered inconsistent reasons related to the hair coloring experience for hiring Orillion to the EEOC). The law is clear that "[i]f the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment." *Crawford*, 482 F.3d at 1308. Therefore, in light of Tompkins's failure to address the salon ownership rationale or Orillion's lack of negative reviews, Tompkins's promotion discrimination claim related to the selection of Orillion fails.

        ii.    *CBU's purported failure to adhere to its promotion process*

The rest of Tompkins's contentions of pretext also fall short. For example, Tompkins cites Kleinman's testimony that when hiring for a manager position, he "generally" would seek input from a candidate's previous manager, doc. 43-2 at 44, and Tompkins contends that Kleinman's failure to consult with Williams about Tompkins before selecting Orillion establishes a deviation from the hiring process or a lack of a consistent process,[8] doc. 52 at 17, 20, 25, 29, 32. Allegedly, had CBU

---

[8] Tompkins argues also that CBU failed to adhere to its process for addressing discrimination complaints. This contention is based on CBU's failure to address Tompkins's October 8, 2012 letter, doc. 52 at 32, which she failed to establish CBU received. The Eleventh Circuit has recognized "'a rebuttable presumption that an item properly mailed was received by the addressee.'" *Barnett v. Okeechobee Hosp.*, 283 F.3d 1232, 1239 (11th Cir. 2002) (quoting *Konst v. Florida E. Coast Ry. Co.*, 71 F.3d 850, 857 (11th Cir. 1996)). Here, however, Tompkins has not shown that she properly mailed her letter, or that CBU is incorrect that she mailed it to the wrong

adhered to its hiring process, Williams would have told Kleinman that Tompkins possessed managerial qualities, such as a pleasant working demeanor, "eagerness to perform janitorial services," and good interpersonal skills, despite "bullying" from coworkers. Doc. 52 at 17, 20, 29.

"[A]n employer's deviation from its own standard procedures may serve as evidence of pretext." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006). Here, however, Tompkins has not established that Kleinman's "general" approach constituted an active CBU policy that mandated that he interview each candidate's manager. Moreover, Kleinman explained that he did not contact Williams because he already had negative information about Tompkins's employment record and saw no need to conduct additional inquiries:

> I would have contacted . . . Johnson or . . . Williams [for advice about the new salon manager]. In the case of . . . Tompkins, at that time, I had become aware that she had been fired for theft at Head Start, and she also had falsified her employment application with [CBU]. So with that information at hand along with the information that I received from . . . Johnson and the other managers, I did not call anybody else. I was not really at the point where I was willing to take a risk and put somebody in charge who had been fired for theft and falsified an employment application.

Doc. 43-2 at 44. As part of her pretext contention, Tompkins attacks this statement by contending that the decision to interview her undermines Kleinman's testimony

---

address. *See* doc. 42 at 18 n. 3. In the absence of any proof that CBU received the letter, Tompkins's contention is unavailing.

that he already had negative information about her. *See* doc. 52 at 20. This contention overlooks Kleinman's testimony that he was open to considering any new information a candidate provided during an interview. Doc. 43-2 at 44. Conceivably, even with the negative information he had, Tompkins may have been able to convince Kleinman through her performance in the interview to overlook the issues in her background that raised a concern for him. In that respect, even if Tompkins is correct that Kleinman had already "predetermined" his decision and that CBU conducted a "sham interview," doc. 52 at 22, the law does not preclude sham interviews absent a showing of racial discrimination. And, ultimately, this is the major flaw in Tompkins's contention, i.e. she has not shown that Kleinman's decision was discriminatory. "To establish pretext, a plaintiff must show that the deviation from policy occurred in a discriminatory manner." *Rojas v. Florida*, 285 F.3d 1339, 1344 n.4 (11th Cir. 2002). While Tompkins may disagree with Kleinman's failure to consult Williams, there is no evidence that discriminatory animus featured in the decision.

### iii. CBU's reliance on information that Head Start terminated Tompkins for stealing

Tompkins argues next that CBU's consideration of information that Head Start purportedly discharged her for stealing is pretextual. Doc. 52 at 18, 27-28. First, Tompkins argues that Kleinman's testimony about when he learned about the termination is inconsistent (as it relates to his conversations with Kathy Dabbs and

Faye Graveman), and she alleges that Kleinman only learned about the discharge after he responded to the EEOC. Doc. 52 at 28. But Tompkins offered no evidence to support this contention or to rebut Kleinman's testimony that he learned about the termination from Middleton prior to his discussions with Dabbs and Graveman. Doc. 43-2 at 46, 53-54. Tompkins's related contention that Kleinman provided inconsistent reasons by referring to the reason for the termination as "allegedly stealing" and at another point for "actually stealing," doc. 52 at 18, is belied by the cited evidence, *see* docs. 43-2 at 44; 43-30 at 2.

Next, Tompkins claims CBU had no concerns about her honesty because Middleton, who had knowledge of the incident as Tompkins's manager at Head Start, hired Tompkins at CBU, docs. 52 at 18, 27, 28; 43-4 at 15, and that she handled money daily at CBU and "perform[ed] the manager's job . . . which require[s] considerable . . . financial responsibility," doc. 52 at 18-19, 27-28. Tompkins implies that these responsibilities should negate CBU's concerns about her termination from Head Start. An employer's willingness to hire someone for an entry level position does not mean that it's failure to overlook a past infraction related to trustworthiness in deciding whether to promote that person to a managerial position is pretextual. And while it may be unfair to judge an employee on her past rather than her current traits, "unfair treatment, absent discrimination based on membership in a protected

class, is not an unlawful employment practice under Title VII [and Section 1981]." *Robertson v. Interactive Coll. of Tech.*, 743 Fed. App'x 269, 274 (11th Cir. 2018).

As for Tompkins's contention that the information from Head Start is incorrect, "[t]he law is clear that even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation." *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989). Finally, contrary to Tompkins's contention that CBU should have allowed her to rebut the theft allegation, doc. 52 at 22, 27-28, there is no legal requirement or CBU policy mandating such an opportunity,[9] and the failure to do so does not discredit CBU's proffered reasons or prove racial animus.

### iv. CBU did not consider Tompkins for the Harvest manager position it awarded to Williams

Tompkins argues next that CBU's failure to consider her for the Harvest manager position it awarded to Williams "imputes a discriminatory motive to all of the events that came after." Doc. 52 at 23. Tompkins asserts that she expressed interest to Johnson, that Johnson did not interview her, and that even Williams believed that Tompkins was the better qualified candidate. Docs. 43-1 at 31-32; 43-

---

[9] Tompkins believes that CBU's process for handling discrimination complaints required CBU to provide her an opportunity to rebut the statement. *See* doc. 52 at 11. Tompkins does not explain, however, why CBU's policies would apply to incidents that occurred at Head Start. *See id.*

6 at 12; 53-13 at 7. To the extent that Tompkins believed CBU denied her that position because of discriminatory animus, she should have filed a lawsuit challenging that determination. And although Tompkins contends she informed Johnson about her interest in the position, there is nothing before the court to show that Johnson, whom Tompkins agrees has interviewed her for other positions, may not have had an honest, but mistaken belief that Tompkins had no interest in this particular vacancy. *See* doc. 43-3 at 45 (Johnson's contention that Tompkins did not ask her about this vacancy).

### v.  *CBU's grant of discretion to managers and its record keeping system*

Tompkins lists next the following factors: managerial discretion, absence of "central record-keeping," certain personnel files "do not exist," missing documentation of reprimands, and Kleinman "spoke to [Tompkins] regarding management and personnel issues." Doc. 52 at 25-26. The court can only speculate about the relevance of these contentions to the selection of Orillion because Tompkins provides no argument or explanation for what these factors show, or how they establish pretext. *See id.*

### vi.  *Kleinman's statements to the EEOC*

Tompkins argues next that CBU provided inconsistent explanations to the EEOC by informing the EEOC about her termination from Head Start, but not about the falsified employment application. Doc. 52 at 18, 27-28. In its initial response,

CBU told the EEOC that "Tompkins has not demonstrated the necessary skill set for promotion to assistant manager or salon manager" and "the leadership skills and abilities to get along with co-workers and management . . . ." Doc. 43-28 at 2. Three years later, CBU informed the EEOC that Head Start had discharged Tompkins for theft. Doc. 43-31 at 3.

Generally, "an employer's failure to articulate clearly and consistently the reason for an employee's [selection] may serve as evidence of pretext." *Hurlbert*, 439 F.3d at 1298. However, an employer may elaborate subsequently to explain its employment action. *See Standard*, 161 F.3d at 1332. And even when there is an additional, but undisclosed reason for the decision, the existence of such does not establish pretext. *Tidwell v. Carter Products*, 135 F.3d 1422, 1428 (11th Cir. 1998) (citing *Zaben v. Air Products & Chem., Inc.*, 129 F.3d 1453, 1458-59 (11th Cir. 1997)).

The information about the falsified application is an additional reason for the promotion decision that does not conflict with the reasons CBU provided to the EEOC. While Tompkins is correct that Kleinman did not mention this contention to the EEOC, doc. 52 at 27-28; 43-31 at 2-5, rather than being a shifting reason, it explains instead and supports CBU's statement to the EEOC that she did not have the skill set for promotion, *see* doc. 43-28 at 2, i.e. that Tompkins lacked honesty and integrity. "[S]lightly differing reasons, or additional, undisclosed non-

discriminatory reasons for the [decision], are insufficient to show pretext." *Trigo v. City of Doral*, 773 Fed. App'x 871, 874 (11th Cir. 2016); *see also Tidwell*, 135 F.3d at 1428 ("At most, the jury could find that performance was an additional, but undisclosed, reason for the decision; the existence of a possible additional non-discriminatory basis for Tidwell's termination does not, however, prove pretext."). Likewise, to the extent Tompkins is claiming the initial failure to inform the EEOC about the Head Start discharge proves pretext, the discharge is not inconsistent from CBU's initial position to the EEOC as the subsequent disclosure regarding Head Start provides supporting evidence for CBU's statement that Tompkins lacked "leadership skills." Therefore, this contention fails.[10]

---

[10] Tompkins also attacks CBU's citation of the falsified application by arguing that CBU is not sincere because "an application is not even required," and Orillion submitted two different incomplete applications. Doc. 52 at 27-28. But Tompkins does not cite any evidence to support either premise, *see id.* at 27-28, and "[s]tatements by counsel in briefs are not evidence." *Skyline Corp. v. N.L.R.B.*, 613 F.2d 1328, 1327 (5th Cir. 1980). Similarly, Tompkins's contention that Kleinman erroneously concluded Tompkins falsified her application, doc. 52 at 27, is unavailing because Tompkins fails to cite evidence to support her contentions, i.e. there is no reference to deposition testimony asking Kleinman to explain how he concluded the application was falsified or to evidence proving that Tompkins's explanation was, in fact, accurate. *See* doc. 52 at 27-28. A party opposing a motion for summary judgment "'must set forth specific facts showing that there is genuine issue for trial.'" *Anderson*, 477 U.S. at 250 (citing Fed.R.Civ.P. 56(e)).

Tompkins also attacks CBU's contentions that she examined personnel files without permission and was not punctual and changed her schedule by claiming in part that Kleinman did not mention these two reasons to the EEOC. Doc. 52 at 26, 30. This contention is belied by the record, which shows that Kleinman provided employee statements to the EEOC informing it that: "Tompkins was in [Brown's] office looking through personnel files" without permission; "[Tompkins] would . . . adjust her schedule to whatever she wanted to work" and had problems with punctuality. Docs. 43-7 at 2; 43-3 at 38-39.

*Not informing Tompkins to submit a written statement responding to Dillard's complaint*

Finally, Tompkins also cites to the incident involving Dillard's client as evidence of pretext, contending that CBU treated her differently than Dillard in its handling of the incident. Docs. 52 at 29; 53-13 at 4-5. More precisely, Tompkins claims that CBU offered Dillard an opportunity to submit a written statement, but failed to give her a similar opportunity, and that Kleinman used Dillard's written statement to determine that Tompkins bore "fault" for the incident. Doc. 52 at 30. But, again, Tompkins cites no evidence to support her contentions. Docs. 52 at 29; 53-13 at 4-5. There is no evidence before the court to show that CBU solicited a statement from Dillard, or that CBU failed to hear Tompkins's side of the story. In fact, Tompkins acknowledges that she relayed her version of the incident to Kleinman. Doc. 43-1 at 22. In that respect, while Tompkins claims CBU failed to inform her she could provide a written statement, she does not explain what additional information she would have provided in a written statement that is different from what she provided orally. *See* docs. 53-13 at 4; 43-1 at 22. And, as for her contention that CBU sided with Dillard, Tompkins appears to quarrel with CBU's determination of fault. *See id.* at 29-30. It is axiomatic by now that courts do not "second-guess the wisdom of an employer's business decisions — indeed the wisdom of them is irrelevant — as long as those decisions were not made with a discriminatory motive." *Alvarez*, 610 F.3d at 1266. Finally, Tompkins's contention

that "illegal animus can be inferred" from the Dillard incident based on Kleinman's actions, doc. 52 at 30, is conclusory in light of Tompkins's own admission that she cut the hair of Dillard's client and Dillard's report to CBU that Tompkins did so without Dillard's permission.

### b. *Tompkins's Cat's Paw Theory Argument*

As an alternative to the *McDonnell Douglas* framework, Tompkins relies on the "cat's paw" theory, doc. 52 at 20-22, 29, which "imputes to an unbiased decision maker the acts of a supervisor that were "motivated by [discriminatory] animus" and "intended . . . to cause an adverse employment action," if such acts are the "proximate cause of the ultimate employment action." *Sanders v. Mercedes Benz U.S. International, Inc.*, No. 7:17-cv-01253-LSC, 2019 WL 330145, at *5 (N.D. Ala. Jan. 25, 2019) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)) (alterations in original). A plaintiff relying on this theory must show that "the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999). However, an independent investigation does not relieve an employer of fault where the supervisor's biased act was *intended* and *proximately caused* an adverse employment action. *Staub*, 562 U.S. at 422. But there is no proximate causation if an employer's adverse act is "entirely justified" apart from a biased supervisor's recommendation. *Id.* at 421-22.

In this case, the biased recommender, Johnson, allegedly "treated [Tompkins] less favorably than white stylists," doc. 52 at 21-22, and Johnson's racial animus may be imputed to Kleinman because Johnson had "sufficient influence over the promotion process to manipulate the result," *id.* at 20. But, while Johnson strongly recommended Orillion, doc. 43-3 at 50-51, there is no evidence that Johnson recommended that Kleinman not promote Tompkins to the position in Harvest. *See Williamson v. Adventist Health Sys./Sunbelt, Inc.*, 372 Fed. App'x 936, 938 (11th Cir. 2010) (citing *Stimpson*, 186 F.3d at 1332) (holding that "a 'cat's paw' theory of recovery may apply when a biased actor recommends that an adverse employment action be taken against an employee, but the biased actor is not the ultimate decision-maker."). Moreover, even if Johnson had made such a recommendation, Kleinman testified that he did not always follow the recommendations he received. Doc. 43-3 at 12. Rather, Kleinman's standard practice consisted of reviewing resumes and applications and directly speaking with managers about candidates before making a decision. Docs. 43-8 at 3; 43-3 at 26; 43-2 at 21. The unrebutted record shows that Kleinman conducted his own research about Tompkins, including speaking with Pinkerton, Middleton, and other managers, and that Kleinman personally considered the information before selecting Orillion. Docs. 43-2 at 37-39, 45-46; 43-8 at 4-5. Kleinman testified also that he discovered independently that Tompkins falsified her employment application and that Head Start discharged Tompkins due to theft, doc.

43-2 at 44, and Tompkins has not cited any evidence showing that Johnson disclosed this information to Kleinman, *see* doc. 52 at 20-22. Based on this record, Tompkins has failed to show that Kleinman failed to perform his own investigation of the candidates, and instead acted solely based on Johnson's recommendations, or that Johnson *proximately caused* Kleinman to bypass Tompkins.

### c. Tompkins's Convincing Mosaic Argument

Tompkins argues also that circumstantial evidence exists that creates a triable issue concerning CBU's discriminatory intent based on a convincing mosaic of discrimination. *See* doc. 52 at 16-17, 26. Tompkins fails to explain however which facts create the mosaic, and it is not the court's role to identify and assemble the relevant facts. As the Chief Judge of this court aptly put it, "[t]o the extent [the plaintiff] relies on a mosaic of discrimination theory, he must present the tiles and create the mosaic instead of expecting the court to piece it together for him." *Murphree v. Colvin*, No. CV-12-BE-1888-M, 2015 WL 631185, at *8 (N.D. Ala. Feb. 13, 2015).[11]

To close, although Tompkins has rebutted CBU's proffered reason concerning her purported lack of "meaningful management experience," she has not rebutted the rest of CBU's proffered reasons for selecting Orillion, i.e. salon ownership

---

[11] *See also Herren v. La Petite Academy, Inc.*, No.: 2:16-cv-01308-LSC, 2019 WL 2161250, at *10 n.10 (N.D. Ala. May 17, 2019) ("[Plaintiff] does not explain which facts could be used to establish a 'convincing mosaic.' The Court declines to make this argument for her.").

experience and lack of negative reivews. And the examples of pretext she cites fail to establish that CBU's articulated reasons are "unworthy of credence." *Rioux*, 520 F.3d at 1275. Therefore, Tompkins's race discrimination claim for the position awarded to Orillion fails.

## 2. Tompkins's Performance of Additional Duties

In addition to the failure to promote claim, Tompkins also alleges that CBU discriminated against her by requiring her, without additional pay, "to perform management duties, and to essentially act as the assistant manager to [Williams], as a condition of her transfer to the Harvest salon . . . ." and that CBU required her to perform "virtually all of the manager's duties at Harvest" after Williams resigned. Doc. 52 at 33-34; *see also* doc. 21 at 13. Other than this statement in her brief, there is no evidence in the record, however, to reflect that CBU required Tompkins to act as the assistant manager, or to perform virtually all the manager's duties after Williams resigned. To the extent Tompkins testified as such, she failed to direct the court to the relevant testimony, and "[s]tatements by counsel in briefs are not evidence." *Skyline Corp.*, 613 F.2d at 1327.

Unlike the assistant manager contention, the record contains evidence regarding Tompkins providing assistance to Williams with "manager's paperwork, and other manager's duties that Williams delegated to her." Docs. 52 at 10; 53-12 at 4. Indeed, Williams testified that she asked Tompkins for assistance about once a

month. Doc. 43-6 at 18. Also, Tompkins testified that after CBU hired Orillion, Johnson asked Tompkins to "continue to prepare the Harvest manager's paperwork," train Orillion, and review the schedule to ensure that employees were covering the shifts, and that Orillion directed Tompkins to distribute paychecks. Doc. 53-13 at 10. Still, Tompkins has failed to show that requiring her to perform these duties occasionally without pay constitute an adverse employment action.[12] Specifically, Tompkins does not explain how these activities had a serious and material impact on the terms, conditions, or privileges of her employment, doc. 52 at 33-34, and has not cited any authority stating otherwise. Moreover, Tompkins does not identify a similarly-situated comparator outside of her race who performed similar tasks but received a pay increase, and has accordingly failed to establish that racial animus factored in the decision to assign her these duties without any additional pay. Therefore, this claim also fails.

---

[12] An "adverse employment action" requires a showing:

> that a decision of the employer "impact[ed] the terms, conditions, or privileges of [her] job in a real and demonstrable way." *Davis* [*v. Town of Lake Park*], 245 F.3d [1232,] 1239 [(11th Cir. 2001)] (internal quotation marks omitted). This "impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id.* The "employee must show a serious and material change in the terms, conditions, or privileges of employment" so that a "reasonable person in the circumstances" would find "the employment action [to] be materially adverse." *Id.*; . . . .

*Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 920-21 (11th Cir. 2018) (first, second, and fifth alterations in original).

**B. Retaliation Claim**

Title VII and Section 1981 "prohibit retaliation against an employee by an employer for engaging in statutorily protected activity." *Ellison v. St. Joseph's/Candler Health Sys., Inc.*, No. 18-10840, 2019 WL 2479712 (11th Cir. June 13, 2019) (citing 42 U. S. C. § 2000e-3; *Bryant v. Jones*, 575 F.3d 1281, 1307-08 (11th Cir. 2009)). To establish a prima facie case of retaliation, a plaintiff must show that she: "(1) engaged in a statutorily protected activity; (2) suffered an adverse employment action; and (3) established a causal link between the protected activity and the adverse action." *McQueen v. Alabama Dept. of Transp.*, No. 17-13405, 2019 WL 1773270, at *5 (11th Cir. Apr. 23, 2019) (citing *Bryant*, 575 F.3d at 1307). In that respect, Tompkins maintains that CBU retaliated against her for engaging in various protected activities. The first such protected activity is a letter she sent to CBU on October 8, 2012. Doc. 52 at 35-36. But Tompkins sent this letter to the wrong address and has failed to show that CBU received it. *See supra* II & III.A.1.a.i. Thus, as to this protected conduct, Tompkins cannot establish "that the relevant decisionmaker was 'aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated.'" *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013) (quoting *Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)). Alternatively, the ten-month gap between the letter and Orillion's selection is insufficient to establish temporal proximity. *See*

*Thomas*, 506 F.3d at 1364 ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough.").

Next, Tompkins claims that CBU retaliated against her because she sent a letter to and then filed a EEOC charge. Allegedly, in retaliation for these two activities, CBU (1) denied her a promotion to the Harvest manager position on two occasions;[13] (2) required her to perform management duties "without the title or pay"; and (3) asked her to return her key to the salon. Doc. 52 at 36. The court will address these contentions separately below.

### 1. Harvest Salon Manager Promotion Awarded to Orillion

A retaliation claim is premised on the allegation that a plaintiff suffered an adverse action *because* she engaged in a protected activity. *See McQueen*, 2019 WL 1773270, at *5. Tompkins cannot make that showing here because CBU selected Orillion *before* Tompkins contacted the EEOC. *See* doc. 43-8 at 5; *see* doc. 42 at 34.[14] Therefore, Tompkins's retaliation claim related to Orillion's promotion fails.

---

[13] As stated previously, Tompkins did not apply for the position awarded to Quick, *see* doc. 43-1 at 39, and thus cannot show that CBU denied her this position for retaliatory reasons.

[14] CBU raised this timing issue in its initial brief, *see* doc. 42 at 34, and Tompkins failed to contest the argument or cite facts demonstrating causation, *see* doc. 52 at 36-37. *See Mosley v. Alabama Unified Judicial Sys.*, 562 Fed. App'x 862, 866 (11th Cir. 2014) (holding that district court correctly found that plaintiff abandoned grounds to support a claim by failing to address them in the opposition brief).

### 2. Performance of Managerial Duties

Tompkins contends also that CBU retaliated against her by requiring her to perform "management duties without the title or pay." This claim fails for the same reason as her race discrimination claim, i.e. Tompkins's failure to cite evidence supporting her statement that CBU required her to act as the assistant manager, or to show that providing assistance to Williams with paperwork, reviewing the schedule, and handing out paychecks constitute adverse employment actions. *See supra* III.A.2.

### 3. Termination of Keyholder Status

Finally, Tompkins argues that retaliatory animus factored in CBU's termination of her keyholder status, doc. 52 at 36, and she cites in support Orillion's testimony that Johnson instructed Quick to do so because of Tompkins's EEOC charge. Doc. 43-1 at 75-76. Although Tompkins has shown a link between the decision and her EEOC charge, this claim fails because Tompkins does not cite any authority for the proposition that the loss of the salon key constitutes an adverse action, and she does not explain how this decision had a serious and material impact on the terms, conditions, or privileges of her employment. *See* doc. 52 at 36-37; *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 920-21 (11th Cir. 2018). For example, Tompkins does not allege that the loss of the key prevented her from working longer hours and earning more money. In fact, the loss of the key did not affect Tompkins's

compensation, doc. 43-8 at 7, and Tompkins acknowledged there were no additional benefits for being a key holder, doc. 43-1 at 20. To the extent that Tompkins is contending the loss of her status as a key holder impacted her standing, "[w]ithout more, such as a demotion, change in title, change in pay, change in work hours, or a transfer, [Tompkins's] perceived loss of prestige is insufficient to establish that [s]he suffered an adverse employment action." *Cornell v. Brennan*, No. 18-12737, 2019 WL 2476611, at *2 (11th Cir. June 13, 2019) (citing *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239, 1242 (11th Cir. 2001)). Thus, this claim also fails.

## IV.   CONCLUSION

Tompkins fails to establish a prima facie case of Section 1981 or Title VII discrimination or retaliation under the *McDonnell Douglas* framework and/or rebut CBU's articulated reasons for the decisions she challenges. Accordingly, CBU's motion for summary judgment is due to be granted. The court will issue a separate order dismissing this case.

**DONE** the 26th day of July, 2019.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE